We will hear argument next in Case 24-624, Case v. Montana. Mr. Rowley. Thank you, Mr. Chief Justice, and may it please the Court. This Court has never allowed state officials to force their way into someone's home without a warrant or probable cause. It should not start now. There is no liberty interest more deeply rooted in the Fourth Amendment than the sanctity of the home. The Court has long recognized that physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed. And the facts here well illustrate what's at stake with such entries. The police entered Trevor Case's home without permission, a warrant, or even probable cause, and they ended up shooting him in his own house. Montana seeks to justify this intrusion under the emergency aid exception, which permits a home entry only when an officer has an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury. As Montana previously acknowledged, that standard, quote, requires, in function if not in form, that officers have probable cause to believe someone's in danger and requires immediate assistance, close quote. Now Montana insists probable cause is not the right standard, but it also doesn't defend the reasonable suspicion standard applied by the Montana Supreme Court below. Instead, Montana and the United States ask the Court to adopt some other threshold that would permit officials, for the first time, to breach the sanctity of the home when they don't have permission, don't have a warrant, and don't even have facts leading to a fair probability that an emergency is actually taking place within the home. Their proposed reasonableness standard is so vague that not even the state in its amici can agree on what it means. And its open-ended balancing approach invites abuse and confusion, leaving police and first responders without the guidance they need and citizens without the security promised by the Fourth Amendment. The Court should adhere to the textual and traditional standard of probable cause. I welcome the Court's questions. Do we normally use probable cause standard outside of the criminal context? Your Honor, the Court has applied probable cause in camera, for example, with respect to administrative warrants, and in other contexts as well. I would point to, for example, Wren, where the Court applied it to civil vehicle infractions. And so the Court has applied it in non-criminal contexts. Would you – what is the objectively reasonable basis standard? Your Honor, I think the objectively reasonable basis standard applied in Brigham City calls for, really contemplates, sort of lends itself to some standard of certainty. And our position is that that standard of certainty is probable cause, the traditional standard that the Court has applied. Yes, Your Honor. I mean, I'm just asking what it means. Is there any difference between that and probable cause? Your Honor, we think that the standard sounds in probable cause. The Court didn't use those words in Brigham City, and it did not use those words in Fisher. But we do think that the standard echoes probable cause. I'd point, for example, to the language in Pringle, where the Court said that the substance of all probable cause definitions is reasonable belief of guilt. And so while the Court didn't use the word probable cause, we do think that there is an echo between the standard applied in Brigham City and the probable cause standard. I was just going to say, when we talk about probable cause, we use it as a shorthand. It's probable cause of what? So, Mr. Chief Justice, here it would be probable cause that an occupant is seriously injured or imminently threatened with such injury. Ordinarily, it would be probable cause to think a crime is being committed. But here, as the government explained in its brief in Brigham City, the object might change. But the way that the standard applies and the level of certainty does not. Why is it something like probable concern or reasonable concern? It seems to me that you're taking a totally different context and applying these things just because we're familiar with them and because authorities are involved. I mean, did they enter this home because they were concerned that, I forget the name of the individual, would harm himself? Or was it because they wanted to arrest him for a particular criminal activity? So, Your Honor, the dispatch call was for a wellness check. But to get to your original question, the court has applied that probable cause standard even though the object of it might change in different contexts. For example, a civil vehicle infraction, that's not a crime. And the standard is still mapped on to it. And we think that it maps on to the emergency context quite well because officers and first responders don't have complete information. They're just trying to assess whether there's an urgent emergency that is happening behind the front door. And probable cause would help them do that. You say urgent emergency. I mean, let's just say it's a patrol or whatever, he looks in the window and there's somebody who seems to be in some distress. Now, is he supposed to say, you know, I can't tell if he has whatever, a pain or if he's having a heart attack or whatever before entering? Or even just lying on the ground. Why is that person lying on the ground? Well, the court said in Fisher that you don't have to have ironclad proof that somebody is dying before you go in. But the standard is under the emergency aid exception as defined in Brigham City, seriously injured or imminently at risk of such injury. And so I do think the court has fixed the threshold. But it said you don't have to have ironclad proof. And that's consistent with probable cause because, of course, probable cause also does not require ironclad proof. What it requires is a fair probability or a substantial chance. And we think that that strikes the right balance given the important and really fundamental interest in the sanctity of the home. I think that's critical. If there wasn't probable cause, then there was nothing the police could do. They couldn't get a warrant either, right? Your Honor, there is a civil warrant available in the state of Montana. But to answer your question, in these circumstances, given the risk, I think what Your Honor is asking is whether they could do it immediately. And it would not be easy to do that. No, it's not a question of whether they could dispense with a warrant requirement. If there's no probable cause, then they can't get a warrant. It seems to me that if the police could not enter this house based on the facts that they knew, then I don't know when the police are ever going to be able to enter a house to prevent somebody from committing suicide. Your client's ex-girlfriend calls them, and she says that he's indicated he was going to kill himself. He was going to get a note. She heard him racking the action on a handgun. Then she heard a popping sound. Then the line went dead. She was screaming on the phone. He didn't answer. They go to the house. They try knocking on the door and yelling. They get no response. They see empty beer cans. They spoke to a neighbor who said his vehicle was parked outside. They shone a flashlight through the window. They saw his keys on the table alongside an empty holster and an apparent suicide note. I mean, what more did they need? Justice Alito, I think what's critical here is the officer's extensive knowledge of Mr. Case. That knowledge goes back decades as to a couple of the officers. Chief Sather testified that he had known Mr. Case his whole life. Capt. Heffernan also had known Mr. Case for a long period of time. But it's not just that. Officer Lindstedt had been present at a couple of the prior incidents that also involved threats of suicide and what was perceived by Officer Lindstedt as an effort to provoke a confrontation with police. That is pretty unusual to have that amount of knowledge about a specific person, and we submit that that weighs against the inference. What more would they need here? They need to be able to look through the window and see him with a gun pointed to his head, or they need to see a dead body on the floor? What more did they need? Justice Alito, I think the question is really what you would take away. If they didn't know and hadn't had such extensive experience with Mr. Case, an experience from which they drew the inference that he was unlikely to kill himself, that what he was likely to do instead was to provoke— Yes, Your Honor. Well, you're saying that because he had threatened to kill himself before and he hadn't carried through, then there were no circumstances under which they could ever enter his house to prevent him from committing suicide if he threatened again. Is that your position? Our position, Your Honor, is as assessed by the officers on the scene, based upon their prior experience with them, with Mr. Case, including, I would note, precipient witness experience, they drew the inference that he was unlikely to shoot himself and that he— I find your argument very odd, right? We're trying to think about a standard here, and I would think that the relevant criteria are the amount of information that the officers had— Yes. —and the threat to the individual, the actual nature of the emergency. And so in this very situation, I'm thinking the fact that they had a lot of information about Mr. Case actually hurts your cause, not helps you. I mean, I understand you'd want them to draw a different inference about it, but this person had a long history of threatening suicide, whether it be by cop or whether it be on his own or whatever. We have a long conversation, detailed, specific, with the girlfriend about circumstances that look like they're creating a pretty significant emergency. I would think this, kind of like what Justice Alito was suggesting, on our axis of information and threat or risk, this seems like it's pretty high. Justice Jackson, I think that that information led the officers on the scene because there are deliberations that are captured on body cam. Those deliberations by officers with quite a lot of extensive experience with Mr. Case are powerful evidence that Mr. Case was unlikely to shoot himself because they're talking about him provoking a confrontation with the police. And I would just quote, for example, Police Chief Sather, who says, he ain't got the guts. This is probably the tenth time I've dealt with him doing this. Or Sergeant Pasha, who says, he's been suicidal forever. Okay, well, setting aside this particular case, let me just try to understand the standard that you want us to apply. Yes, sure. You say that it should be probable cause. I thought we already had the emergency aid exception requiring, quote-unquote, an objectively reasonable belief that an emergency is occurring. And I didn't hear that in your recitation. You said you want it to be a fair probability or substantial chance. So can you just describe for us or explain why it would need to be a higher standard than objectively reasonable belief? So, Your Honor, we think that the objectively reasonable belief standard really lends itself to some standard of certainty. And we think that the traditional probable cause standard is the appropriate formulation. I think you're saying you only have an objectively reasonable belief, in your view, if you meet the threshold of probable cause. Yes, Justice Jackson. And I would say that the fair probability language and substantial chance, that's all from Illinois v. Gates. Those are just principles associated with probable cause. And we think that they make a lot of sense in this context as they do in the context of investigatory searches and seizures. I wonder if this is just a labeling exercise, Mr. Rowley, at the end of the day. Because when we're interpreting the Fourth Amendment, we often look at what the common law has been, was, what positive law. We don't always, but we often do. You know, cats is another thing. But Jardines tells us to look at the actual law. And one thing I'm struck by here is, you know, a private person would have a good necessity defense to a trespass claim, always, historically it appears, from what I can tell, when it reasonably appears necessary to prevent serious harm to the occupant. And that's almost exactly what Brigham City says for officers. And officers can't have any fewer rights than a private citizen to enter a home to render assistance. Now, that doesn't give them a license to go rummage about the place for crimes, but it does give them a license to enter to render assistance. I would have thought, what's wrong with just saying Brigham City reflects traditional common law principles and officers are treated the same as private citizens? Justice Gorsuch, I have a few responses to that. I bet you do. The first response is, when the court looks to common law examples, what it's asking about is what the authority of constables was at common law. And so I'd just point to Wilson, for example. The common law of search and seizure recognized a law enforcement officer's authority to break open the doors of a dwelling. So what was the constable's authority at common law? But the constable doesn't have fewer rights than a private citizen. We've often said that. Justice Gorsuch, when the court talks about that, about the ability of officers to do the same things that an ordinary person is doing, ordinarily it's talking about whether there's a search, whether the Fourth Amendment is even implicated. Right, and that's another whole question, whether there's even a search here. But I'll take as given that there's a search for the person to render assistance, but not for other purposes. It's not a license to go rummaging about the place. It is a license perhaps to enter and search for the occupant who's facing a serious risk. But the necessity defense was a broad-based common law toward defense. As my friend points out in the respondent's brief, it was applicable to private parties as well as constables. So it doesn't say anything specific about constable authority. But it applied to both, and it didn't require the magic words probable cause, whatever they may or may not add. Justice Gorsuch, even if it did, even if you were to consider the necessity defense as the controlling principle here, as the state has suggested, it would hardly help the state because it was, if anything, more stringent than the probable cause requirement or the AFRAI rule because you had to be right. Well, the United States cites the restatement. Yes, okay. But at common law, you had to be right that the necessity actually… What's your best authority for that? I would point to the state's own cases. I would point to Rex. I would point to the Wakeham case. In general, at common law, you had to be correct. Now, there is this reasonableness gloss in the second restatement. I would note that the state hasn't pressed this argument. It hasn't suggested that there ought to be some generalized necessity defense that would be drawn from modern-day tort principles. The way this has come up in the briefs, as you suggested, is by way of common law. And, again, I think the relevant question is what was the authority of constables? And they had all these specific rules that are set out in the treatises. I thought the hesitation of the officers that you pointed out before showed care before rushing in and thoughtfulness by the officers. So why don't you look at it that way? Your Honor, I think that the delay, there were deliberations that were quite extensive, and it took them 40 minutes to go in, as the dissent in the decision below noted. That amount of time is inconsistent with the kind of urgency you would expect if what you thought was happening was somebody was either bleeding out or was about. What if they, after deliberations, walk away and he commits suicide? I mean, what are you thinking then of the officers? That would be unfortunate and tragic, but we are trying to strike a balance between it. And the officers need some clarity, I would think, in circumstances like this about what they can do and what they can't do, and it seems like they thought about it carefully and decided that the risk was sufficiently high to Justice Jackson's point and the harm that would occur was sufficiently substantial that they should go in. And, by the way, they're going in at great risk themselves. Of course, Your Honor. You know, this is not Justice Gorsuch is pretextually looking for a crime or going in for some other pretextual reason or going in to, you know, for a... It's going in, really, to help someone. A couple of responses. One, there were certainly two risks that were possible. There was the risk that he was going to shoot himself, and there was the risk that he would try to provoke a confrontation with the officers. J.H., the ex-girlfriend, actually identifies both risks. In the initial call, she expresses concern that Mr. Case is going to shoot himself. When she arrives on the scene, because she comes to the scene, she says that he also said that he was going to try to shoot it out with the officers, and that echoes what Officer Lindstedt says when he arrives on the scene. What he says shortly after arriving is, Last time we were here, he, like, said he was going to shoot it out with, and then he mentions another officer and I, and then later on he recounts another incident where Mr. Case tried to provoke a confrontation. I'm sorry. On his perception. Sorry about that. On the articulation of the standard you want, do you have examples where, under the current law, officers would go in, but you think, under your test, they wouldn't and shouldn't and couldn't go in? Well, Your Honor, I think the swatting example that we cite in our brief is a very real concern. It's a pretty commonplace concern where somebody calls, and under the United States theory, I think it's at page 22, where you would use the severity of the threat to ratchet down the level of certainty that's required. If somebody made a swatting call and said, well, there's a bomb inside the house, it's a pretty big bomb. I walked by the house and I'm worried that it's going to blow up the block. You wouldn't even need corroboration. You could just go in. And so we think that just requiring a fair probability or a substantial chance and some corroborative work, and I think in a lot of heartland scenarios, the police would have that. Yes, Justice. I'm sorry. Did I cut you off? Please. One of the things that strikes me here is the term probable cause is not itself self-defining, and most of the way we know what probable cause is is because we have a body of case law that talks about it, and it talks about it in an investigatory criminal context. And in this context, that way of figuring out whether there's probable cause just disappears because that's not the context we're in. So I guess I'm wondering whether then taking a term from a context which has a body of precedent that is pretty much irrelevant to this one, that seems like a bad idea, and maybe what we did in City of Brigham and in Fisher is exactly what we should have done. We just use a different language, and we don't try to grade that relative to probable cause. It's just sort of a different inquiry, but it does focus on what's important. Do you have to have an objectively reasonable basis for believing that somebody needs emergency help? And I guess what I'm saying is maybe in those two cases we did the best thing possible, and we're not going to be able to do anything better. So, Justice Kagan, the Court's always been reluctant to adopt a third standard. I think in Montoy it said... Well, we did adopt a third standard, or, you know, a third standard. I mean, we used different words for this different context, and why not just leave it at that? Because, Your Honor, it produced a lot of confusion in the lower courts, as we explained in our cert petition. You had a significant number of circuits and states that applied a lower standard akin to reasonable suspicion like the Montana Supreme Court did here. You had other states that applied a probable cause standard, and we do think that given that this situation is so recurring and that... But why not just say, this is a different context. Our probable cause precedents are pretty much irrelevant and can't help us. We think we got the standard right. That doesn't mean reasonable suspicion. Reasonable suspicion is an entirely different thing. Go figure it out, case by case, in the normal way that courts do. Well, even the state doesn't defend reasonable suspicion at this point. I know, and we would say it's not reasonable suspicion. You know, it's just this. Do you have an objectively reasonable basis for believing that emergency help is required? If the court were to reject a reasonable suspicion standard, we would be entitled to a remand even on that ground. But we do think that it would be better, that the better approach is to provide a little more guidance to officers and first responders. And while probable cause hasn't been applied by all courts, it actually has been applied by a significant number of the lower courts in this specific context, the general principles that apply there when you're assessing probabilities, comparing the relative strengths of different sources of information, those map on pretty cleanly. And even if the court just drew on concepts like fair probability and substantial chance, that would actually be helpful. Like fair probability and substantial chance, why are those any better than objectively reasonable basis? I feel as though we're just substituting your terms for our terms. So these were our terms. We used them twice. Let's use them again. Because reasonable basis to believe, we submit that it lends itself to some standard of certainty, but it doesn't spell it out. And for officers and first responders who are trying to figure out, it's pretty dangerous to go into a house as the common law source is recognized, as officers express concern about all the time. And so you need some level of certainty for officers and first responders to decide, look, we know enough. There's a substantial chance that somebody is seriously hurt behind that door. And so it makes sense to take the risk and go in. And we think that that standard is certainly preferable to a reasonable standard where you're balancing interests on the ground the way the state and the United States have suggested. If I might, I would just say that the Court has always expressed concern about in reactive situations where officers are trying to make quick decisions about engaging in balancing. The Court expressed concern about that in Dunaway. I think Justice Barrett has a question. Yes, Your Honor. Counsel, I think we're fighting about labels, and you got to the point, but just keep resisting it, okay? The Court below did not use our Brigham City standard. It used a reasonable suspicion standard. I'm quoting from itself, from the decision below. Objective, specific, and articulable facts from which an experienced officer would suspect that a citizen is in need. Reasonable suspicion, as we've defined it, means a particularized and objective basis for suspecting the particular person stopped of criminal activity. So they used a standard akin to reasonable suspicion. Yes, Justice Sotomayor. So what you're saying is whatever standard we announce, we should vacate and remand to go back. And the question becomes, how is Brigham City different than probable cause, other than in its objective? I got two quotes. I mean, one quote from two of our cases that says, probable cause, quote, is a reasonable ground for belief of guilt. Our Brigham standard says, we're not talking about guilt here. Our Brigham standard says, objectively reasonable basis for believing, that's a reasonable ground, that an occupant is seriously injured or eminently threatened with injury. I don't know if Justice Kagan was right. This is, in my mind, simple. Apply the right standard and tell us what the objective facts were. Correct? Yes, Your Honor. For believing that the occupant was seriously injured or eminently threatened with such injury. Yes, Your Honor. I would just say that that formulation in Brigham City did generate a bit of confusion in the lower courts, even though we submit that it is consistent with and really resonates with probable cause. Well, it doesn't resonate with reasonable suspicion. It does not, and we would be entitled to a remand on that ground. But I want to make sure I get to Justice Barrett's question. Yes, Your Honor. Thank you. I think it's very difficult because we talk about how much information the person has. It could be more pertinent in a situation of how little information they have. I mean, think about an officer who walks down the regular beat and there's a picture when there is some person lying on the sofa that looks like he's, you know, kind of an awkward position and keeps going down. And two hours later comes back, it's the same thing. He knows nothing about it except that the guy appears perhaps to be dead or passed out or something. So he knocks on the door, he knocks on the window and gets no response. And then figures, you know, he's worried about it. He breaks the door down or hits the lock and he walks in and the person wakes up and there's, you know, three kilos of whatever. And, I mean, is that, I mean, is it wrong that he did that out of legitimate concern and he didn't know that, you know, that's just, you know, Fred or whatever? I mean, I'm just trying to think. I would want a police officer in a situation who walks by and sees somebody in the community that seems something's wrong. You know, he hasn't moved in four hours. It doesn't look like he's taking a nap. But, you know, and then what happens? I mean, then does he have sufficient basis to, you know, justify the search that led to the illegal drugs? So he doesn't know anything. I mean, maybe if he knew a little more or maybe it's his regular habit is to go to the pub at night. And that's why I find it very difficult to articulate a standard. I mean, you know, I don't think it can be based on a probability of something going awry or because you do want police to be, you know, on the lookout for things that might be dangerous, even if it's not a crime, a criminal. Certainly, but the court has always said subjective intent. So you might well be concerned as an officer or a first responder or even an ordinary citizen that something's going wrong inside the house. But there could also be innocuous explanations, even in the scenario that you just sketched out, Mr. Chief Justice. In a lot of the scenarios that Justice Kavanaugh similarly sketched out in his concurrence in Cornelia, it could tack either way. But oftentimes in those scenarios, the report, especially if it's from a neighbor or from a relative, is going to have a lot of information about why it's uncharacteristic, why this is weird. And that is powerful information and can be linked up with corroborating evidence to support going in. And at least it guards against unnecessary and needlessly dangerous confrontation. Justice Thomas? Justice Alito? What is the substantive difference between the words that were used by the Montana Supreme Court and the words that we used in Brigham City? So, Justice Alito, what they said was objective, specific, and articulable facts from which an experienced officer would suspect that a citizen is in need of help. What's the difference between that and what we said in Brigham City? A reasonable basis to believe that someone is seriously injured or imminently threatened with such injury is different because it doesn't use the word suspicion. And I think the dissent is right to say that the words used in the majority opinion below sound in Terry. Not just the use of the word suspicion, but even the specific and articulable facts. That's Terry-type language. In the footnote that accompanies that standard, the majority analogized and said it was comparable to the Ninth Circuit's exigent circumstances test, but the language is quite different, and it is not the Brigham City language that Justice Sotomayor quoted. I had a couple more questions. I'm puzzled by your explanation of why the police did what they did. Why did they go in, in your view? Why do I think subjectively? I think that they treated it, to be honest, as a community caretaking exercise. They didn't think he was... They didn't think he... Put aside the fact that the Fourth Amendment looks to objective facts, not just subjective. But your view is they didn't really think he was going to commit suicide. What he really wanted to do was to commit suicide. He wasn't going to kill himself directly. He wanted to commit suicide by police. So they said, well, all right, let's go in. So he will pull a gun on us, and then we will shoot him. If that's what he wants, we're going to oblige him. I'm totally puzzled by your explanation of what you think really went on here. Justice Alito, I think that that risk is the risk that was focused on in the on-the-scene deliberations. I'll just quote, again, Sergeant Pasha. He's been suicidal forever, and he hasn't done it, but there have been several times when he's tried getting us to do it. Later on, Sergeant Pasha says, I'm scared that maybe he didn't actually shoot himself because he can't, and he's tried suicide by cop before, and he left us all this, so we're going to go into the house, and he's going to pull a gun on us. So they wanted to oblige him in his desire to commit suicide by police, and thereby expose themselves to serious risk of death or serious bodily injury. That's what was going on? Your Honor, at a certain point when you watch the video, they get sort of a head of steam, and they're starting to just prep to go in. And, of course, they have to do some prep, but they are focused on taking the preparations that they'll need in case he wants to shoot it out with them, and that kind of momentum leads, after 40 minutes, to the entry. But, again, if you consider the on-the-scene assessment by officers who knew Mr. Case and the risk that they thought was the serious one, it was the risk that he was going to provoke a confrontation. If we write an opinion, and we set out the facts of this case, and we say, well, it has to go back to the Montana Supreme Court for them to apply the Brigham City test, will it not be the case that those people who instruct police officers are going to say, wow, if the Supreme Court thinks that this is even a close case, it has to be sent back to the Montana Supreme Court. We don't know when you can ever go in and try to prevent somebody from committing suicide unless you literally see through the window the guy's got a gun to his head, or they see a dead body on the floor. So, look, let's do the safe thing. We're just not going in unless we've got absolutely ironclad proof. Justice Alito, three things. The court's already said in Fisher you don't need ironclad proof. The second thing is, of all the Supreme Court justices on the Montana Supreme Court, there was not a single justice who voted to uphold this search under a probable cause standard, and three justices said it did not meet probable cause. And the final thing, I again would go to the officer's own assessment. It is an unusual case because they had so much information about him, and it's not just that they knew him. One of the officers was a percipient witness, was there at two of the prior incidents. Thank you. I get it. Justice Sotomayor? Counsel that the state court is applying a lesser standard than reasonable suspicion, it cited the Lovegreen, its own precedent, Lovegreen. Yes. And in Lovegreen it said, it characterized community caretaking stops as the least intrusive category of stop, even less intrusive than a Terry stop. And that's the standard they're using. That's right, Your Honor. And that's not the standard we set in Brigham. It is not. Now, stop trying to help yourself. I've gotten the point there, right? Let me get to the second point, which is Brigham also said the manner of entry has to be reasonable, okay? The one thing that nobody ever discussed here, including Justice Alito, is he does this when he's drunk, correct? Your Honor, the call was that he had been drinking. And all of these calls to the police had been, nobody thought of just letting him ride out his drunkness, did they? No, Your Honor. There's a comment on the tape. I believe it's Officer Lindstedt who poses the question, do we leave him? But it is ambiguous as to what he's connoting. All right. Now, they also didn't think of, instead of death by suicide, since he never pulled a gun on anybody else, okay, getting medical personnel to go in, which lots of divisions do on suicide cases, don't they? They do, Your Honor. Here, I just would note that Officer Lindstedt did ask, should we stage medical? But I don't think that they did that and there was no further discussion. That's the point. They didn't try to call. They didn't do anything except not get a warrant and break it, correct? That's right, Your Honor. They talked about calling other people, family members, the father. They talked about calling him. They ultimately, at least on the body cam videos, there's no... So there's a real question, even for the court below, whether the entry under the facts of this case, not generally when you're really afraid of a suicide, because they're saying he doesn't have the guts. It's not one officer. A bunch of them were taking... it sounded to me like they were taking bets on it and everybody was saying he wants suicide by cops, he's not going to shoot, he doesn't have the guts. Right, Justice Sotomayor. I would quote the dissent. What the dissent says is, all the officers on the scene stated that it was unlikely case required immediate aid, but rather was likely lying in wait for them to commit suicide by cops. So they can decide, not us, on these facts, whether it meets the Brigham standard. Yes, Your Honor. What we do know is that the Montana court used a different standard, lower than reasonable suspicion. That's right. Thank you. Justice Kagan? Justice Gorsuch? Justice Kavanaugh? One question, and maybe Montana can answer this, weigh in if you don't know. Would it be normal or best practices to send in just medical personnel when someone has copped a gun over the phone and is known to be armed? No, Your Honor. I believe in those circumstances, officers would be called to the scene. Thanks. Justice Jackson? In those circumstances, would you think there was probable cause? Setting aside the quirky details of this case and all the stuff the officers knew, under your probable cause standard, if we just had the girlfriend call and what they observed when they got to the scene? If they actually, I want to be careful, because if what they actually got was a call that said, not a pop, but there was a gun, the action, as Justice Alito suggested, was engaged and there was a... Really? It has to be that detailed? Well, a pop could be anything over the phone. I think it's different if there's slide action or you can hear the gun being engaged in some way. I don't want to belabor this. I guess I'm just trying to isolate suicide by cop knowledge and find out whether under your own test, all the stuff up to that point would count, and you're just saying we don't have probable cause because of the suicide by cop scenario. Yes, Your Honor. It's all the information that is countervailing about the risk. Thank you. Yes, Your Honor. Thank you. Mr. Corrigan? Mr. Chief Justice, and may it please the Court, this Court should affirm the judgment below for three reasons. First, the Fourth Amendment protects against unreasonable searches, not all warrantless ones. The framers enshrine that tradition of reasonableness, not a rigid warrant rule in the Fourth Amendment. At common law, officers and private citizens alike could enter the home as required by necessity when life is at risk. Petitioner's rule would turn that structure upside down. He asked this Court to graph the warrant clause's probable cause requirement into the reasonableness clause itself. That move has no basis in text, no footing in history, and no support in this Court's exigency precedence. Second, this Court has already set the standard for emergency entries at objective reasonableness. To adopt Petitioner's view, this Court would have to overrule the holding in Brigham City v. Stewart, discard Michigan v. Fisher, and recast probable cause, the classic criminal law concept about belief of guilt, into something entirely new and applicable to non-criminal, non-investigatory emergencies. Third, the objective reasonableness standard provides sufficient guidance and flexibility for emergency aid cases. Conversely, a rule demanding probable cause of peril would force officers to stand outside a dying man's door, calculating legal thresholds instead of saving his life. That's not what the framers wrote, and that's not what this Court has ever required. The Montana Supreme Court applied the rule required by the Constitution and this Court's precedence. Officers may enter when they have an objectively reasonable basis to believe someone inside needs immediate aid. That standard is faithful to text, history, and common sense. I welcome the Court's questions. Did the Montana Supreme Court cite Brigham City? It cited its own case law, and it relied on Cornelia, which relied on Brigham City. But there seems to be a disagreement between you and Petitioner as to whether or not that standard was applied. It applied the Brigham City standard. It applied the totality of the circumstances about whether officers had an objectively reasonable basis that someone inside needed immediate aid. And so it applied the words of Brigham City. Isn't it our normal practice, though, if we're not certain about the standard and we state a new standard, that we send it back? Yes, Your Honor, in some instances. But I think it's very clear what standard the Montana Supreme Court applied here. And the facts are particularly strong that whatever standard this Court lays down, the facts here satisfy it, that the officers' care had an objectively reasonable basis for believing Mr. Case needed immediate aid. Would it be helpful, do you think, to clarify? I mean, there's some ambiguity about what the standard was that was applied. So we don't care about that, okay? It's what we said in Brigham City. And then apply that standard to these facts. We don't have to. We could send it back. But would it help to provide guidance to confused lower courts for us to use a concrete set of facts to explain what that means? Absolutely, Justice Gorsuch. This is a scenario that officers face every day. Emergency aid scenarios are very common. Whether it's a suicide call, like in this case, a call of an elderly individual who's missing, or a hybrid scenario like Brigham City or Fisher. Having this Court apply whatever the Brigham City standard to the facts in this case would be very helpful. And we have a full enough record to do that, you think? Absolutely. All right. And what do you say to your friend on the other side about the necessity of defense being more liberal under the restatement than it was at common law? I think at common law, my friend on the other side pointed to the cases of Rex v. Cody and Scott v. Wakeham. When you read those cases, it's all based on a reasonableness analysis. In the Rex v. Cody case, the restraining was justified if it had been proved to have been with the best motives or necessity was manifestly proven. To me, that sounds like a reasonableness standard. Now, some of the issue in terms of the reasonableness standard at the time is that we don't, in tort law, we don't get the full reasonableness standard until 1837 in the Vaughn case in England. But Cook is writing in the 16th century about applying the law of reason to the reasonableness of the common law. And so implicit in jury and judicial verdicts at the time, the concept of the ordinary person and reasonableness is baked into the common law in England and the common law here, and, of course, textually in the Fourth Amendment. Does Montana follow the restatement? We follow the second restatement, Your Honor. Counsel, we talk about this as an emergency situation, but there's a lot going on that doesn't look like an emergency, right? I mean, they get there, they're walking around for a while, then what, they get the boss to come down? I mean, they call for somebody else, and they're still there, and then they go get a body shield? I mean, it doesn't have the atmosphere of, you know, we've got to get in there right away. And I wonder if that detracts from the idea that they had sufficient justification. And particularly since, as Lisa has said, the emergency would come in if the officers came in, and then you'd have the question of suicide by police. Well, Mr. Chief Justice, I would certainly agree that at some point if they did wait too long, that would cut against an emergency. But in this case, I think the timeline is very important. Officers arrive on the scene at 9.14 p.m., his ex-girlfriend arrives at 9.18, they do a knock and announce, they knock several times, and they spend the next 20 minutes trying to verify the facts that she communicated to them in this case. And it's at 9.34 p.m. that, as they're doing the search of the outside of the house, that they identify the suicide note when they flash their flashlights through the window. And so they spent about 20 minutes trying to verify the facts that were communicated to them. And I do think, though, that the possibility of suicide by cop counseled additional caution on their part. And you see this on the body cam. Of course they are worried about the instance of suicide by cop, but that's why they're doing the additional investigation of walking around the outside of the house, yelling into an open window, giving Mr. Case every opportunity to let them know that he is alive and inside, which he didn't do. General, does Montana have... I mean, it seems to me that there's some confusion in the case law. I mean, I think there was some sloppiness in the standard in this case. Does Montana have some separate community caretaker exception or something that it calls a community caretaker exception that's really equivalent to our emergency aid section from Brigham City? Yes, Justice Barrett. I think that's when the Montana Supreme Court discusses the community caretaking exception, I think they're folding in Brigham City. There was some confusion, I agree, in the standard, but it's an exigent circumstance exception to save human life, and I think that's essentially what they did. Okay. I mean, they're free to call it as a matter of state law, I guess, whatever they want to call it, but you would agree that there is no such strand, that we've rejected that. We've rejected it in Camellia. It's been a long day. But that the emergency aid exception and the standard from Brigham City is all you're asking for, and you're not saying that there's some, yet another, looser standard. That's correct. We are entirely consistent with Brigham City and Caniglia. We're not asking for anything beyond that. And on the- I'm sorry. In their citation to Lovewood, did we just ignore where they said it was less than reasonable suspicion? Well, the court is admittedly using imprecise language. What I think is what's important is that the court is applying the totality of the circumstances, and it's making sure the scope and manner of the search is reasonable. And, of course, as my friend was up here and the court was asking questions, pointed out that the court does use some language mirroring at times in sort of the more specific application of the test that mirrors reasonable suspicion. But this court has done that in TLO and the special needs cases. And so what the court is looking to do is make sure that the scope and manner of the search are reasonable and balancing the privacy interests at hand. I actually don't see any of them addressing the reasonableness of the manner in which this occurred. And I pointed to things. Justice Barrett was right. You're not going to send medical personnel into a room with an armed person. But you do call medical personnel to make calls or to talk to someone who's suicidal on the phone. It happens quite often. They could do that. You could put a megaphone out there. I will point out the time exigency here is that they did call medical personnel when Case, after the entry, and he had been shot. But the officers here- Yes, after he had been shot. When they had a great probability of knowing that he was seeking to be their suicide bycatch. There's no indication that EMTs would be able to talk down Mr. Case. In fact, Chief Sather, who had known Case for 30 years, testified that, based on prior incidents, he actually thought that he could talk Case down and get him out of the house. It was only after they received the reliable indicia that Case had actually suffered a gunshot wound that the chief arrives and says, we have to go in. Am I right, just to go back to where you ended with Justice Barrett, that you're not equating the City of Brigham standard with our Terry Stops standard? Correct. You think that those are two different things? I think they're two different things. Okay. And as to the difference between the City of Brigham standard and the probable cause standard, is your position that the City of Brigham standard is laxer, or is your position that it's just different? I think it's more flexible. And I think it answers a different question. So as the Court recognized when my friend was up here earlier, probable cause isn't just about reaching a specific threshold, it's fixed to criminality. But objective reasonableness says, given the totality of the circumstances, would an officer taking a specific action be reasonable? And I think one way to think of it might be, probable cause is a single determination about whether a quantum of proof has been satisfied. But objective reasonableness, as in this case, can be a progressive analysis. And what I mean by that is when officers- So it would help me, I think, because that's a lot of words. But what's the case in the gap between the two? Like, what is it where a police officer would not have probable cause but can satisfy the Brigham City standard? What are the kinds of things you're talking about? So I think if you take this particular case and subtract perhaps Mr. Case's history, which I actually think supports the officer's reasonable determination, or if they had not obtained the other reliable indicia, so if Case's ex-girlfriend had called him, she had heard the cocking of the gun, heard what she thought to be a gunshot, police arrive, they knock on the door, they don't receive any response, but they hadn't been able to see the suicide note, which might have been upstairs with him, they hadn't seen the beer cans or the empty paddle holster, I think that's a much closer call, but we think that's still objectively reasonable. And I would point out that our friends on the other side believe that even the very strong facts in this case don't satisfy probable cause. And so I think if the court, to Justice Alito's questioning earlier, if the court were to determine that the facts in this case do not satisfy probable cause, that is going to have very detrimental effects down the road for law enforcement. Thank you. They say they don't satisfy probable cause because they're reducing. That was my question to him at the end, which is without the suicide by cop information, do you think we get there? I thought he suggested we did, but it was the fact that the cops also had this additional information that made it less likely, or objectively less likely, that Mr. Case would actually commit suicide. Well, I think it's important to put the suicide by cop in context. So some of what's happening at the scene, I think his cop talk of Sergeant Pasha is clearly very concerned about suicide by cop. The context of suicide by cop first came up when Case was on the phone with his ex-girlfriend, and he says, I'm going to kill myself. And she responds, well, if you threaten that, I'm going to have to call the police. And she says, or he says, I'll shoot it out with him. Chief Sather responds to Sergeant Pasha's concern about that comment by saying he doesn't have the guts. So I think the dissent is incorrect at the Montana Supreme Court to say all the officers believed. And our point is, is certainly suicide by cop was a possibility, but that was, I think the officers ruled that out based on his escalating history of violence going back to 2015 and the incident that was 18 months earlier. And particularly once they found the note, Chief Sather is convinced that he actually has hurt himself this time. In terms of the test of reasonableness, we admit that a reasonableness, objective reasonableness, is an easy test, but it may not be an easy rubric to always apply, where the court is taking the privacy interest versus the nature of the exigency. But I think the court just did this in Barnes. And the court admitted that it's a fact-bound morass that demands careful attention to the facts and circumstances, including the facts and circumstances leading up to the climactic moment. And the court has to consider all relevant circumstances. And I think that the excessive force context makes a lot of sense here. When we're talking about, at its apex in this context, the sanctity of human life versus the sanctity of the home. And the excessive force context also involves two strong competing interests of the safety of the officer versus the use of deadly force. And the logic of Barnes makes sense here. The application of it makes sense. And in terms of Brigham City, in terms of hybrid scenarios that have been brought up, I think that Brigham City and other cases that involve underlying criminal activity recognize, though, that first responders are first responders first. When they arrive on the scene of an emergency, they're not necessarily concerned about underlying crime. Their first instance when they respond to someone yelling help is to provide aid to someone in need. They can worry about arresting someone for a crime or other criminal activity later on. We treat hybrid cases the same as all other exigencies. And what's important to remember is, as I was articulating to Justice Kagan, is the objective reasonableness standard allows a progressive analysis. And so when the officers arrive and do a knock and announce, it may not be objectively reasonable right away for them to go through the front door. But it allows them to go around the curtilage, to yell through an open window, to take progressive steps to alert the individual and give them every opportunity to respond and let them know that they are okay. And I don't think that probable cause allows that sufficient flexibility and doesn't differentiate between going through a door and breaking down a window. Whereas the Barnes standard and the reasonableness standard differentiates between the facts that make it reasonable to handcuff a suspect versus to tackle a suspect or to use deadly force. And that's why we think that the Montana Supreme Court appropriately applied this court's test in Brigham City. This court met what it said in Brigham City, met what it said in Fisher, that officers may enter when they have an objectively reasonable basis to believe someone inside is in need of immediate aid. Thank you, Counsel. Justice Thomas? Justice Alito? Counsel, our entry into the home cases, and it's been paramount that a person's home, we don't enter without a warrant except in recognized exceptions. And I understand the instinct that says that we don't want someone in real need, not to have the police enter quickly, but we're always balancing interest, aren't we? And not requiring enough proof also costs lives. Petitioner cites reports that people with serious mental illness are 16 times more likely to be killed by police during a police encounter. An investigation found at least 178 cases in a two-year period where calls for help, not a crime, like a 9-11 call or a wellness check, resulted in the police shooting and killing the people they were called on to assist. To find balance, but shouldn't we make sure that the courts below are at least following the right standard? You keep telling us that this state is, despite using words that sound very similar to reasonable suspicion, despite a case, Lovegrin, that says it's less than a Terry stop, there's some value in clarifying what we have said the standard is. If you're asking us to describe what the quantum of proof, it sounds like you wanted us to accept what the solicitor general is saying, some possibility is enough, but that's never been the standard. It's a reasonable belief, not a probable belief. So I agree that clarification from the court, and I think the court can clarify that it meant what it said in Brigham City, it meant what it said in Fisher, and that an objectively reasonable basis is what it is. And that's not reasonable suspicion. It's not necessarily reasonable suspicion. Ah, there's your qualifier. In some cases the standard can look like reasonable suspicion, and in some cases the flexibility makes it look more like probable cause. But there's where we're getting to the degree of certainty of the exigency. And you want it to be reasonable suspicion. Well, the objective reasonableness standard is the most faithful to the text, history, and tradition of the Constitution. If given a binary choice, we would take reasonable suspicion over probable cause. But objective reasonableness is much more flexible and faithful to the text, and it accounts for situations like this one or others where there is some doubt as to whether an individual is in need. So you might as well just say what the court below said. It's less than a Terry stop. Well, I think I'd look to the language in Fisher where the court says, officers, of course, are going to have less than perfect information, but that doesn't mean they should walk away from potentially dangerous situations. And all we're asking is that they use their common sense. Officers, as well as reviewing courts, are more than capable of figuring out when the facts don't add up and when an objectively reasonable belief doesn't exist. And I think I'd go back to this court could apply whatever standard it articulates to the facts in this case to provide ample guidance to lower courts. Ms. Skate? I think I'm confused, General, because I thought you told me that the city of Brigham standard is not the same as the Terry stop standard, and that you were not asking for the latter. It's not. It's not in all cases. The Brigham city standard is the Brigham city standard. In terms of the degree of certainty, it can vacillate between probable cause and reasonable suspicion. The text is just more complex than that. Thank you. Ms. Gorsuch, is this fair? You might be better off just sticking with Brigham city. I think maybe what you're saying is that in some circumstances, applying reasonable suspicion or objective reasonableness in the Brigham city sense might yield the same result. Just like sometimes applying Brigham city and probable cause, whatever it might mean in this context, might yield the same result. But are you really saying that we should do something different than in Brigham city or muddy the waters by saying, oh, you know, objectively reasonable basis, but could be reasonable suspicion? You're correct on the first part, on the former. We are not saying that Brigham city means reasonable suspicion. What we're saying is in some instances it could, as you said, Justice Barrett, yield a result like reasonable suspicion, just like it could yield a result like probable cause. We don't need to say that. I think that would be confusing. I think we could just say Brigham city, objectively reasonable basis to believe, and put a period on that. I agree, Justice Barrett. Okay, thanks. Thank you, counsel. Mr. Covey. Mr. Chief Justice, and may it please the court. This court should adhere to the objective reasonableness standard for emergency aid entries set out in Brigham city, rather than require what petitioner calls probable cause of a danger. Petitioner's theory has no basis in the fourth amendment's text, which links probable cause to warrants, not to searches in general. History doesn't support petitioner's theory either. The framers adopted the fourth amendment to guard against overzealous criminal investigation, not to hamstring officers from providing life-saving aid to people in need. Yet petitioner's rule would make it harder for government officials to help people in crisis, from victims of domestic violence to older people who have fallen and can't get up. This court should instead reaffirm that emergency aid entries are assessed for reasonableness, a flexible determination that accounts for both the severity of a danger and its likelihood. States are always free to craft their own rules above that constitutional floor, but the fourth amendment does not categorically require probable cause of a danger for an emergency entry. I welcome the court's questions. Should we apply this rule here or send it back? We think you should apply this rule here. I think there has been some question about the Montana Supreme Court's use of the word suspect in its test, but I would urge this court not to read a decision like a statute, especially because elsewhere in the decision the Montana Supreme Court said that its test largely mirrored the Ninth Circuit's test, which uses the objectively reasonable basis for believing language, and because it used other verbs elsewhere besides suspect. I think Pet op 14a footnote 5, they say there was an objectively reasonable basis for finding a danger. So I would avoid sending it back just on the basis of that word suspect. I'm sorry, but when they addressed the dissent's accusation that they were using reasonable suspicion, nowhere did they say we're not. It would have been the easiest thing to do. We're not using reasonable suspicion. Instead they said we don't have to because it's a different purpose than an arrest. It seems to me that that's not a disavow. I do read them to sort of disavow that they're applying a reasonable suspicion standard. No, they said we're not giving open license, but they didn't disavow it. I think even if you disagree with me about that, the reason not to send it back is the one that Justice Alito articulated earlier, which is if you give officers and lower courts the impression that there is any doubt about whether the facts here satisfy the Brigham City test, I think that's going to lead to a lot of confusion and a lot of concern that officers can't make entries based on the type of information that they would think they could. If we apply it here, are we ignoring the countervailing factors of why they shouldn't have gone in? We have a number of officers on tape saying he has no guts, he won't kill himself. We have other officers saying he's waiting for suicide by cops. There's no attention paid by the officers to trying the father or to calling a doctor to call out to him, not go into the place. All they decide to do is go in. Are we then inviting a carte blanche to say, don't think of a more reasonable way or manner to enter? I don't think so, Justice Sotomayor. I'd point to a couple things. One, I'd avoid relying too much on the cop talk that's on the tape, especially because in the record in the J.A. at the suppression hearing, several of the officers did testify, sworn testimony, that they were subjectively afraid that he had in fact injured himself. Did they give a basis for that? I think the call and the suicide note and the empty holster. So I think this is a situation in which there were risks of multiple outcomes, and the fact that they articulated a concern about one of those outcomes doesn't mean there wasn't also an objectively reasonable basis for believing that the other outcome might have happened as well. So I take it that you agree with Montana that the degree of certainty can vacillate under the Brigham City test, and that that's really the work of your sliding scale. Is that right? I think that's right. What I would say is it's not so much like in one case you need probable cause and in another case you need reasonable suspicion. Our point is just that there is not a fixed prescribed quantum of certainty of danger that needs to apply in all cases. The amount of information, the reliability of information, the corroboration of information that an officer would need to make their entry reliable in one instance may not be the same as in another instance. But those are the key factors. Would it be helpful for us to kind of say that kind of thing? In other words, I understood your sliding scale to have a matrix essentially that related to the severity and the amount of information. I think so. To be clear, I think the sliding scale, you know, it's just a metaphor. We don't mean it's sort of strictly formulaic or a matrix or anything like that, just that these are relevant considerations that can make an entry reasonable. Yeah, I don't understand the sliding scale thing at all, I'll be honest, so help me out. I understand lots of different facts can lead to an objectively reasonable basis, okay, and it's almost impossible to catalog them all. But on the other hand, on the severity, we said in Brigham Young what we meant, Brigham City, sorry, I am tired, that it has to be a severe risk of harm to the occupant, I'm paraphrasing, but life or limb is the classic formulation in Blackstone. The severity is the severity. There's no sliding scale. You don't get to go in with lots of evidence to deal with a hangnail. I absolutely agree with that. There's sort of, I mean, I think what we would think of for the sliding scale, there's an outer bound on the sliding scale formed by Brigham City's use of that serious injury. But not all serious injuries are alike, and our point is that based on sort of the degree of the exigency, the severity of the injury being complained about, it may be reasonable in some instances for officers to rely on less information or less reliable information, and in other instances it may be reasonable, it may not be reasonable to rely on. I understand that point. Do you have any thoughts about the common law of necessity? Yeah, I think our point is that that's a useful guidepost here for the reasons that Your Honor articulated, the fact that private individuals were able to enter when life and limb were at stake, we think provides some helpful guidance about what the framers would have thought was reasonable here. I don't think that we think of it as a direct one-to-one analog, but I don't really think it's our burden to come up with a direct one-to-one historical analog here, given that we have the text of the amendment on our side, and it's really Petitioner who's asking to graft onto the Fourth Amendment's reasonableness standard this uniform probable cause requirement that is not compelled by the text of the amendment itself. Would you object to the court specifically saying that the officers have to have more than reasonable suspicion that an emergency is occurring? I think we would object to it for a couple reasons. I mean, one, I think because reasonable suspicion is a standard from the criminal law, just as probable cause is, for the reasons that Justice Kagan was just articulating with my friend, just pegging it to any one of these criminal investigation standards I think does more harm than good. But why is that? Isn't that familiar? I mean, they're used to those standards, and so I appreciate that they do it in the criminal context when they're looking for crimes, but they understand, I would think, the difference between probable cause and I'm more focused on reasonable suspicion in that context, and so why couldn't we just say you have to have more than reasonable suspicion that an emergency is occurring? Well, two points. First of all, police officers may be familiar with reasonable suspicion, but your standard here will also apply to firefighters, paramedics, all of whom may have no more familiarity with reasonable suspicion than with probable cause, and reasonableness is, I think, an easier standard to understand. Second of all, I do think just given how varied emergencies are, it's best not to sort of set a floor at reasonable suspicion just because this court can't really predict all the manner of emergencies that could arise, and rather than hamstringing courts or officers with setting a floor on this, better to just stick with the objectively reasonable basis test from Brigham City. Thank you. Justice Alito? In Brigham City, I'm quoting from the ESG's brief. One way to conceptualize the emergency aid situation is that the basic requirement that the police have an objectively reasonable belief, i.e., probable cause, dash, does not change. But the object of the probable cause does change. Rather than requiring an objectively reasonable basis for an officer to believe a cause, no matter where the crime has been or is about to occur, the officer needs an objectively reasonable basis to believe that an emergency need for assistance exists. Have you changed your position? Yes. After the court's decision in Brigham City, which used the objectively reasonable basis language but did not draw that connection to probable cause that we had sort of floated in a footnote, we did rethink that, and in Coniglia, or Coniglia, our brief five years ago, we made clear that our view is that probable cause is not the correct standard. May not be, but Brigham is. Yes, Brigham City is the correct standard, and we sort of disavow that equivalence. And reasonable suspicion is not? Not the correct standard either. Objectively reasonable basis, just from Brigham City, is the correct standard. Justice Jackson? Thank you, counsel. Rebuttal, Mr. Rowley? Thank you, Mr. Chief Justice. I think it's critical to remember that what we're dealing with here is an entry into the home, and there are these default constitutional rules that are decades and decades old. As the Court has repeatedly said, at the very core of the amendment stands the right of a man to retreat into his home and there be free from unreasonable government intrusions. In Payton, the Court said that the Fourth Amendment has drawn a firm line at the entrance to the house. And so these rules do not require, if you apply a probable cause standard, some kind of fundamental tweaking of Fourth Amendment jurisprudence. We think that they are a natural application of these basic Fourth Amendment principles. I would also stress that in a lot of these situations where the emergency aid exception arises, you have not just potential safety implications, but also criminal implications. Think of domestic violence situations or the situation that the officers faced here. And so having a parallel standard of probable cause to think a crime is being committed, but also probable cause to think that somebody is seriously injured or imminently threatened with such injury makes good sense. Conversely, if you adopted a standard that was a sliding scale, as the government has suggested, or a lower standard for the emergency aid exception, there is the potential for abuse. You could backdoor your way into a criminal investigation. I'd just note that while the state now has expressed concern about applying a probable cause standard, in its brief in opposition, it noted that a significant number of lower courts apply a probable cause standard, and they say it's functionally a probable cause standard, even if what they say in terms of the standard or the words used is different. And the court didn't suggest that that was a problem or that that stopped police officers and other first responders from going in and helping with an emergency. And so we don't think that applying a probable cause standard, which is the default standard, would prevent officers from stopping or intervening in an emergency on the common law, because Justice Gorsuch asked about that. I'd just note that the cases that my friend features in the respondent's brief, best cases presumably, do say that the defendant, or the potential tortfeasor, has to be right. In Scott v. Wakeham, the court says, and I quote, the question was not whether the defendant sincerely believed he was right, but whether he was so. So this reasonableness gloss is a restatement gloss. I think the more fundamental point, though, is that when you are asking about constable authority, the focus is what the rules that govern constable power and what they could do are the cognate rules, and the closest one is the affray rule. It actually applies to the same set of circumstances that were at issue in Fisher and in Brigham City. Both of those involved what I think the court called a melee or a fracas that is essentially an affray. And we know what the common law thought about that. What the common law thought was that the constable had to see or hear the affray if he wanted to break down doors and part the affray. That standard is fundamentally inconsistent with a standard below probable cause. The necessity defense and none of the other specific rules that the state and the United States outline supports a standard below probable cause. And so we think that the common law is more supportive of our position than theirs and that it echoes not just the language in Brigham City, but it also underscores other exigent circumstances cases like Minnesota v. Olson where the court has said that probable cause for an exigency is essentially the correct or the proper legal standard, and also in Santana, which involved an exigent circumstance after all, a hot pursuit, and the court applied a probable cause standard not just for the underlying crime, but to think that an exigency existed. The last thing I would say is that the United States says that reasonableness is an easier standard to understand than probable cause, but as Justice Jackson observed, probable cause is as settled a formulation as you're going to find in the Fourth Amendment. It's a standard that officers have applied that the courts have developed over decades and decades. As the court said in Dunaway, the familiar threshold standard of probable cause for Fourth Amendment seizures provides the relative simplicity and clarity necessary to the implementation of a workable rule. A balancing test, particularly a sliding scale test, will not only be unfamiliar to first responders, but particularly unfamiliar to officers and other first responders. Thank you, counsel. The case is submitted.